STARK COUNTY BAR ASSOCIATION *v.* LUKENS.

(D. D. No. 76-12—Decided December 15, 1976.)

*Mr. Donald E. Fiely, Mr. Eugene Andrews* and *Mr. Ray L. Marchbank,* for relator.

*Mr. Harry W. Schmuck,* for respondent.

*Per Curiam.* In reviewing the record before us in this matter, it is manifest that there is a continuing and shocking lack of diligence by respondent in carrying out his responsibility as an attorney in representing his clients.

Count 1 was admitted by respondent. He testified that the file was somehow placed in his "dead files when he moved offices." The $100 that he had received was eventually forwarded to another attorney who completed the case.

Count 4, also admitted, involved a failure to file a petition for dissolution of marriage. Respondent claimed that he was in an automobile accident later that day; and that he still has the $300 retainer and is able and willing to make restitution.

Count 6, also admitted, occurred due to respondent's being in the hospital, and this was followed by his being absent from the office due to health problems. He retained the $250 deposit for court costs, for work completed, and for anticipated duties.

Count 7, also admitted, could not be recalled by respondent, except that the file was misplaced. Respondent did not dispute that Raymond Marchbank, one of the counsel for relator, took over and completed the case. Respondent indicated his willingness to reimburse the client.

Count 8, admitted, indicated that the respondent never returned the file to his client, although he claimed it was always available. The client felt that respondent should have mailed or delivered the file to him. Respondent maintained that the contract upon which he was to file suit was signed only by the wife, that she was deceased, and that he could not pursue the matter.

Count 9 involved the handling of a sizeable estate. Immediately upon being employed as attorney, respondent without any authorization secured $2,000 as part of his fee. Respondent claimed to have done considerable work on the estate and intimated further that he was always available for consultation. Mr. White, the son of the administratrix, disputed this claim and testified that 61 telephone calls and a number of visits were made to respondent's office without success. In any event, White eventually secured other counsel to complete the estate, specifically to file the fiduciary income tax return, the federal estate tax return, and the final account. Respondent alleged that the tax returns were in the process of being done by him. The estate paid the second attorney $1,200 to complete the estate. During the course of the administration of the estate, respondent received an additional $700 for his fees. Relator and respondent stipulated that the allowable attorney fee in this size estate would have been $2,746. The respondent was employed from on or about December 10, 1970, until June of 1972 when the file was obtained by White and turned over to the second attorney. The final account was eventually approved on July 23, 1973. There was no evidence of mishandling of funds by respondent.

Count 11 concerned respondent's representation of two defendants charged with breaking and entering, grand theft, and possession of burglary tools. Respondent was charged with failing to appear at several hearings, resulting in his clients being reprimanded by the judge. Eventually, a negotiated plea was made to breaking and entering only. After investigation by the probation department, the defendants were not notified by respondent to appear for sentencing. A capias was issued and the clients were brought before the judge and, as stipulated herein, received 60-day jail sentences, the remainder of their sentences being suspended. It was claimed that respondent had advised these clients that there would be no jail sentence. Respondent denied he ever intimated this. He claimed he did attempt to contact his clients and, in fact, although

ill, personally went out looking for them late at night. After the incarceration, the mother of one of the clients, a Mrs. Davenport, felt her son could be released from jail if his employer could contact the judge. Respondent was allegedly called again and again to see if his assistance could be used to approach the judge. The net result was that the client Davenport served the entire 60 days. The judge appeared as a witness for relator and testified that at no time did he ever indicate that there would be no jail time. The respondent testified that he was in the hospital during part of the time and was also sick at home. He felt the retainer he received was justified and that, overall, he adequately represented his clients. He attributed part of the problem to lack of sufficient telephone numbers to reach his clients. This was disputed by Mrs. Davenport and her son.

Count 13 involved the representation of a client in a bankruptcy case. Respondent was paid the costs and fees to file the bankruptcy. He never did file the case, which resulted in another attorney's completing and filing same four or five months later at no charge to the client. On two occasions before the second attorney took the case, wage attachments were made against the client. Respondent claimed he became ill during this time and was in Arizona. He denied telling his client that he had filed the petition and intimated further that he advanced his own funds to pay one of the wage attachments.

Count 14, the final count, concerned yet another facet of general practice, a real estate transaction involving the preparation of a deed, the bringing up to date of an abstract, and the rendering of a title opinion. The client had advanced $50 to respondent for costs. Thereafter, no action was taken for several months. Ultimately, respondent's office associate did deliver the executed deed to the client. The client complained that he tried to contact respondent numerous times about the matter. Respondent claimed that he was ill and not in the office much of this time. He stated he verbally approved the abstract, and that he was slow because the client owed him fees on a prior case. He did

state he stands ready to provide title insurance or find and return the abstract.

Respondent testified at some length about his health problems. Since 1970, there is no question that respondent has been the victim of a debilitating persistent illness brought on by, among other things, a severe case of diabetes and porphyria. In addition, much of the medicine he took complicated his condition. He was confined to hospitals or at home on a number of occasions. He admitted that he could not function adequately much of the time, but since he had a rather large family to support, he kept hoping that things would improve and so proceeded as best he could. His doctor testified in some detail and supported respondent's position that over the past five or six years respondent was in constant trouble, severe pain, and in an extremely weak state due to his maladies. The panel felt that respondent's ailments were obvious merely by observing him during the hearings.

It is apparent that respondent's problems were directly linked to his physical and emotional conditions. Time and again respondent offered as a defense to the various charges that he was in the hospital, ill at home, or just unable to function properly at the office. All this gives rise to the basic question of whether a member of the legal profession should continue to hold himself out as an attorney in general practice, undertaking new and possibly complicated cases, when he has full knowledge of his condition and its attendant problems (which respondent obviously did). We do not believe he should. If a lawyer cannot stand the rigors of an active general practice due to his health problems, he should not be permitted to maintain a posture of competency and availability as regards the general public.

Respondent was warned several times by the Stark County Bar Association (officially and informally) that there were complaints against him. Still, he persisted in undertaking new cases and new clients when many of the prior matters were left unattended.

Respondent continues to attempt to practice law and desires to remain a member of the Ohio Bar although he recently has secured a position in Arizona as head of security for several race tracks. He testified that he is deeply in debt due to his hospital and doctor bills and, in fact, does not maintain any bank accounts for fear of attachment. He seldom visits his office. He currently is involved in a dispute with a client over representation in a driving-while-intoxicated case.

After a concerned and extended consideration of the record, the findings of the board of commissioners and the briefs, we are of the conclusion that there is overwhelming evidence to support the board's finding that respondent was in violation of the Code of Professional Responsibility, specifically, Canon 6, DR 6-101(A)(3), Canon 7, DR 7-101 (A)(2) and Canon 9, DR 9-102(B)(4).

Therefore, respondent, Donald F. Lukens, is indefinitely suspended from the practice of law.

*Judgment accordingly.*

O'NEILL, C. J., HERBERT, CORRIGAN, STERN, CELEBREZZE, W. BROWN and P. BROWN, JJ., concur.